**James W. LOEWEN et al., Plaintiffs,**

v.

**John TURNIPSEED, Mississippi State Textbook Purchasing Board, et al., Defendants.**

**No. GC 75–145–S.**

United States District Court,
N. D. Mississippi,
Greenville Division.

April 2, 1980.

Frank R. Parker, Lawyers' Committee for Civil Rights, Jackson, Miss., for plaintiffs.

Peter M. Stockett, Jr., Asst. Atty. Gen., Jackson, Miss., for defendants.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

The action sub judice is before the court after an eight-day nonjury trial for decision on the merits. The court has received and given consideration to the post-trial memoranda and proposed findings of fact and conclusions of law submitted by the parties as well as all pretrial submissions. Based upon the pleadings, the evidence, exhibits and memoranda and proposed findings of fact and the conclusions of law submitted by the parties, this Memorandum of Decision is released and contains the findings of fact and conclusions of law for which provision is made in Rule 52(a), Fed.R.Civ.P.

### I. Findings of fact.

#### A. The Parties.

The plaintiffs named in the complaint, as amended, (hereinafter "complaint") are: James W. Loewen and Charles Sallis, the editors and two of the eight co-authors of *Mississippi: Conflict and Change*, a ninth grade textbook in Mississippi History; Monseigneur Paul V. Canonici, Director of Educational Services of the Diocese of Natchez-Jackson, and, as such, the chief administrative officer of Roman Catholic parochial schools within the diocese, which schools are alleged to be qualified to participate in the Mississippi free textbook program; Father Luke Mikschl, Principal of the Holy Child Jesus Elementary and High School, Canton, Mississippi, a Roman Catholic parochial school; Sister Maureen Sullivan, a teacher of Mississippi History at Holy Child Jesus School; Gregory C. Coleman, Stephen G. Lloyd, Theon E. Lloyd, and Hailicia D. Lloyd, black students enrolled in grades nine, seven, five, and kindergarten, respectively, at Holy Child Jesus School, who join in this action through their mother and next friend, Mrs. Alease C. Lloyd; Jacquelyn Ann Chinn, Marie Theresa Chinn, and Madelin Chinn, black students enrolled in grades nine, eight, and four, respectively, at the Holy Child Jesus Elementary School, who join in this action through their mother and next friend, Mrs. Mamie Chinn; the County Board of Education of Jefferson County, Mississippi, together with its president and individual members; the Superintendent and Assistant Superintendent of Education of the Jefferson County, Mississippi School District, a Mississippi public school district; Willie R. Harding and Hennie B. Taylor, teachers of Mississippi History and related subjects in the Jefferson County School District; Nancy Humphrey and Tara Humphrey, black students enrolled in grades nine and eight, respectively, in the Jefferson County School District, who join in this action through their father and mother and next friends, Charles and Dorothy Humphrey; and Catherine Gilmer Gray, a white student enrolled in grade eight at the St. Andrew Episcopal Day School, Jackson, Mississippi, who joins in this action through her father and next friend, the Right Reverend Duncan M. Gray, Jr.

The defendants named in the complaint are John Turnipseed, Howard Riales, Ben Burney, Evelyn Wilder, Mary Kyle, Virginia McElhaney, and James Wash, individually and in their official capacities and collectively as the full membership of the "rating committee" appointed by Mississippi's Gov-

ernor and State Superintendent of Education to appraise, and, in the exercise of their judgment, recommend textbooks submitted by publishers for use in a required high school course of study, Mississippi History, as provided by § 37–43–21 of the Mississippi Code of 1972, Annotated; the Mississippi State Textbook Purchasing Board, its members The Governor of the State of Mississippi, the Superintendent of Education of the State of Mississippi, Larry Tynes, L. L. Morrison, Sr., and Jean McCool, and its Executive Secretary, W. A. Matthews, in their individual and official capacities.[1]

B. *Nature of Action.*

This suit arises from the actions of the "rating committee" defendants in refusing to recommend for adoption as a textbook in the course of Mississippi History, the book *Mississippi: Conflict and Change* edited by the plaintiffs, Dr. Loewen and Dr. Sallis, who are also two of the authors of the book, and in recommending for adopting in the course of Mississippi History the book *Your Mississippi*, by Dr. John K. Bettersworth. Plaintiffs claim that said actions of the "rating committee" defendants, and of the Mississippi State Textbook Purchasing Board, and its members, in ratifying the actions of the "rating committee" defendants, deprived them of their rights guaranteed and secured by the First, Thirteenth and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. § 1981 and § 1983. Jurisdiction is vested in this court pursuant to 28 U.S.C. § 1343(3) and (4).

C. *The Nature of Relief Sought.*

Plaintiffs request the court to grant the following relief:

.(1) An order enjoining defendants to forthwith promulgate and implement procedures, consistent with due process, for hearings on textbooks submitted to state authorities for adoption;

(2) An order enjoining defendants from limiting the submission and appraisal of textbooks to intervals longer than one year;[2]

(3) An order enjoining defendants to forthwith approve for use in eligible schools of the state, at state expense, the textbook *Mississippi: Conflict and Change*;

(4) An order enjoining defendants from engaging in policies or practices which discriminate against textbooks containing perspectives on history at odds with those traditionally acceptable in Mississippi;

(5) A judgment declaring § 37–43–21 of the Mississippi Code of 1972 unconstitutional;[3]

(6) An injunction enjoining defendants from denying approval to any submitted textbook which meets minimum standards of scholarship, satisfies fundamental and reasonable curriculum requirements and which obtains the endorsement of a local school district board of education and its rating committee;[4]

(7) An order awarding plaintiffs costs and reasonable attorneys' fees;

(8) An order granting such additional or alternative relief as the court deems just and equitable.

D. *The Applicable State Law.*

The pertinent laws of the State of Mississippi governing the process of recommending and adopting books for use as textbooks in the eligible schools of the State of Missis-

---

1. At the time of the institution of this action, Honorable William L. Waller was governor and Garvin H. Johnson was Superintendent of Education of the State of Mississippi. Honorable William Winter is now Governor and Charles E. Holladay is Superintendent of Education of the State of Mississippi.

2. Plaintiffs have modified the request to provide for biennial submission and approval of textbooks.

3. Plaintiffs have abandoned their request for this relief.

4. Plaintiffs have abandoned the following provision of this requested remedy: "And which obtains the endorsement of a local school district board of education and its rating committee", and ask that education criteria be promulgated.

sippi are found in Chapter 43, Title 37 (§§ 37–43–1, et seq.) Mississippi Code of 1972, Annotated. This chapter is entitled "Textbooks". The sections pertinent to the action sub judice are set forth verbatim in Appendix "A" to this Memorandum.

### E. *The Evidence.*

In the fall of 1974, the Mississippi State Textbook Purchasing Board, pursuant to rules and regulations adopted by it based on the authority delegated to it by § 37–43–19, caused notices to be sent to the representatives of publishers advising that qualified publishers might submit proposals for the sale of books for use as textbooks, in various courses of study, including the subject of Mississippi History, to be taught at the ninth grade level. In response to the Board's notice, the following books were submitted by publishers for rating and adopting as textbooks in the course of Mississippi History: Steck-Vaughn Company submitted the book *Your Mississippi* by Dr. John K. Bettersworth; and Pantheon Books, a Division of Random House, submitted *Mississippi: Conflict and Change* edited by the plaintiffs, Dr. James W. Loewen and Dr. Charles Sallis.

As mandated by the provisions of § 37–43–21 of the Mississippi Code, and in accord with the practices and procedures of the Board, these two books were submitted to a rating committee for appraisal and recommendation. In accordance with the statute, the Governor of the State of Mississippi, then Honorable William L. Waller, and the Superintendent of Education of the State of Mississippi, then Dr. Garvin L. Johnston, appointed as members of said rating committee the defendants Burney, Kyle, McElhaney, Riales, Turnipseed, Wash, and Wilder. Based on its statutory authority to promulgate rules and regulations relating to the rating and adoption of textbooks, the State Textbook Purchasing Board had established certain criteria for use by rating committees in rating proposed textbooks in Mississippi History. These criteria were furnished by the Board to the defendant members of the rating committee and consisted of (1) the Board's memorandum to rating committee members, Ex., P–6; (2) the Board's pamphlet, "Suggested Criteria for Textbook Selection," Ex., P–7; and (3) the State curriculum for Mississippi History contained in Mississippi School Bulletin, "Social Studies in the Junior High School," (April, 1967), Ex., P–8.

The defendant rating committee members in due course appraised and rated the two books submitted to them in the course of Mississippi History. The ratings given by each defendant on each book are as follows:

Benjamin B. Burney, Jr., gave the textbook *Your Mississippi* a rating of "2", and the textbook *Mississippi: Conflict and Change* a rating of "1".

Mary Kyle gave the textbook *Your Mississippi* a rating of "2", and the textbook *Mississippi: Conflict and Change* "no rating."

Virginia Wilkins McElhaney gave the textbook *Your Mississippi* a rating of "1", and the textbook *Mississippi: Conflict and Change* "no rating."

Howard E. Riales gave the textbook *Your Mississippi* a rating of "1", and the textbook *Mississippi: Conflict and Change* "no rating."

John Marion Turnipseed gave the textbook *Your Mississippi* a rating of "1", and the textbook *Mississippi: Conflict and Change* "no rating."

James E. Wash gave the textbook *Your Mississippi* a rating of "1", and the textbook *Mississippi: Conflict and Change* a rating of "2".

Evelyn Harvey Wilder gave the textbook *Your Mississippi* a rating of "1", and the textbook *Mississippi: Conflict and Change* "no rating."

The defendant rating committee members Kyle, McElhaney, Riales, Turnipseed, and Wilder are members of the White race; the defendant rating committee members Burney and Wash are Negroes.

The rating committee members returned their appraisals of the two books to the

Office of the State Textbook Purchasing Board. Because of the procedures established by § 37–43–21 of the Mississippi Code, the State Textbook Purchasing Board had no authority to adopt the book *Mississippi: Conflict and Change* for use as a textbook in the course of Mississippi History. Said § 37–43–21 provides, in pertinent part, that "in no case shall the board adopt any book not recommended by the rating committees." Said § 37–43–21 also stipulates "no book shall be recommended which does not receive a majority vote of the members of each committee." Only two of the seven members of the rating committee, defendants Burney and Wash, gave a rating to *Mississippi: Conflict and Change* ; a rating by a minimum of four of said rating committee members was necessary to recommend said book to the State Textbook Purchasing Board for adoption.

The book *Your Mississippi* received a rating from all seven members of the rating committee and was eligible to be adopted by the State Textbook Purchasing Board as a textbook in the course of Mississippi History. The State Textbook Purchasing Board did adopt *Your Mississippi* for use as a Mississippi History textbook for a period of four years, to be extended for an additional two years.

The procedures followed by the Mississippi State Textbook Purchasing Board and the members of the rating committee during the adoption process were those generally followed in accordance with the applicable statutes of the State of Mississippi and the rules and regulations of the Textbook Purchasing Board. For the purpose of evaluating and rating books for adoption as textbooks for the 1974 textbook adoption proceedings, the defendant members of the rating committee were appointed, according to statute, by the Governor of Mississippi and the Superintendent of Education of the State of Mississippi, for the general area of the curriculum designated as "Social Studies, Career, Humanities, 7–9." There were 10 courses of study embraced within this area of the curriculum, including the course of Mississippi History to be taught at the ninth grade level. There were 106 books submitted by publishers for adoption in this area of the curriculum, which were evaluated and rated by the defendant members of the rating committee.

After receiving notice of their appointment as members of the rating committee, the rating committee members were requested by the Textbook Purchasing Board to attend, and did attend, a meeting held in the auditorium of the Woolfolk State Office Building in Jackson, Mississippi, on August 28, 1974. Members of all rating committees appointed for the 1974 adoption proceedings were present at this meeting, as well as the Governor, the Superintendent of Education, officials of the Textbook Purchasing Board, and certified publisher's representatives. At this meeting, the defendant members of the rating committee received copies of a number of documents, including the *Suggested Criteria* (Ex., P–7), "Mississippi Textbook Adoption," (Ex., D–13), summary evaluation forms for each book to be considered for adoption, and a list of all certified publisher's representatives who were the only persons authorized to present books to the rating committee members during the rating process.

Under the schedule established by the Textbook Purchasing Board, the rating committee reports, otherwise known as the "ballots," and the accompanying summary evaluation forms were due to be received at the Office of the Textbook Purchasing Board from the rating committee members no later than October 23, 1974. During the interim between the meeting of August 28 and the deadline of October 23, the rating committee members received copies of the books to be evaluated and rated, either through the mail or by personal delivery from a publisher's representative. At various times during this interim period while the work of the rating committee members was being accomplished, publisher's representatives were making appointments with, and presentations to, the individual members of the rating committee for the purposes of relating pertinent facts about the book being presented and of answering any questions about the book which the rating

committee member might have. During this period, the rating committee members rated and reviewed the books under consideration for adoption, including *Mississippi: Conflict and Change*.

Approximately two weeks prior to the October 23 deadline for receipt of the "ballots" and summary evaluation forms, the Office of the Textbook Purchasing Board mailed to each member of the rating committee a "ballot" for each course of study for which books were to be rated and recommended for adoption, along with a Memorandum of Instructions for rating books (Ex., P–6). In evaluating and rating the books for adoption, including the books submitted for the course of Mississippi History, the members of the rating committee were guided by the documents previously mentioned furnished them by the Textbook Purchasing Board, especially the *Suggested Criteria for Textbook Selection* (Ex., P–7). The members of the rating committee completed their work, filled out their rating committee report and summary evaluation forms, and mailed them to the Textbook Purchasing Board in Jackson, Mississippi, for arrival on or before October 23, 1974. The staff of the Textbook Purchasing Board tabulated the results of the "ballots" mailed in by the rating committee members, and the Mississippi State Textbook Purchasing Board held a meeting on November 4, 1974, and adopted the recommendations of the rating committee by placing on the adopted list for the course of Mississippi History the book *Your Mississippi* by Dr. John K. Bettersworth. The Textbook Purchasing Board was precluded by provisions of state law from considering *Mississippi: Conflict and Change* for adoption, because that book failed to receive a recommendation from a majority of the rating committee members.

One salient fact should be noted with regard to the rating process as to the books submitted for consideration in the course of Mississippi History. Each rating committee member was visited by a representative from Steck-Vaughn Company, publisher of *Your Mississippi*, for the purpose of presenting that book. This publisher's representative made a positive presentation of that book, and answered questions that the members of the rating committee had about it. The Steck-Vaughn representative left with each rating committee member, in manuscript form, a copy of a Teacher's Edition to accompany *Your Mississippi*. The Teacher's Edition which accompanies *Your Mississippi* was introduced into evidence in printed form by the defendants in this case (Ex., D–17). The Teacher's Edition of *Your Mississippi* is the same as the edition for use by students, except that the first 60 pages contain material to aid the teacher in teaching the course. The representative from Pantheon Books, a Division of Random House, also visited each member of the rating committee. This representative did not make a positive presentation of the book *Mississippi: Conflict and Change*. He stated to the rating committee members, Mrs. McElhaney, Miss Kyle, Mrs. Kennington, and Mr. Turnipseed that no Teacher's Edition would be available to accompany *Mississippi: Conflict and Change*. He stated to the rating committee member, Mr. Riales, that a Teacher's Edition was not then presently available, but would be available in the future.

The plaintiffs, Dr. James Loewen and Dr. Charles Sallis, testified at the trial that a Teacher's Edition of *Mississippi: Conflict and Change* was available in manuscript form during the 1974 adoption period, but that it was not furnished to the publisher's representative who presented that book to the rating committee members.

The statutes of the State of Mississippi, the rules and regulations of the Textbook Purchasing Board, and the testimony of Mr. W. A. Matthews, Executive Secretary of the Mississippi State Textbook Purchasing Board, make it clear that the only parties to a textbook adoption proceeding in Mississippi are: (1) the members of the various rating committees; (2) the certified publisher's representatives, who are the only persons authorized to make presentations of books to members of the rating committee; and (3) the Mississippi State Textbook Purchasing Board, the members thereof, its executive secretary, and staff.

The *Suggested Criteria for Textbook Selection,* (Ex., P–7), which guided the members of the rating committee in their work, contains 16 general criteria and five specific criteria. Criterion No. 5 of the specific criteria states that each book proposed for adoption should be accompanied by a teacher's edition, one copy to be furnished free for each 25 copies to be used by the students. Criterion No. 6 of the general criteria provides that each text should either contain appropriate suggestions for teachers or be accompanied by a separate teacher's manual.

As has been noted, the two black members of the rating committee, Burney and Wash, rated and recommended the Loewen and Sallis text, *Mississippi: Conflict and Change* (1974). The five white members of the committee, Kyle, McElhaney, Riales, Turnipseed and Wilder, rated and recommended the Bettersworth text, *Your Mississippi* (1975) but failed to recommend the Loewen and Sallis text, *Mississippi: Conflict and Change*. The Textbook Purchasing Board had the statutory power to reject the recommendations of the rating committee and call for further recommendations, but was not empowered to adopt the Loewen and Sallis text, *Mississippi: Conflict and Change* (1974) because the book had not been recommended by the rating committee.

Each rating board member was charged with the duty of making known to the purchasing board the basis of his or her acceptance or rejection of a textbook. The five members of the board who rejected the Loewen and Sallis text, *Mississippi: Conflict and Change*, had an obligation to state in writing his or her reasons for the rejection.

The Textbook Purchasing Board furnished each rating committee member with a Summary Evaluation Form to be completed on each textbook submitted and to be returned to the board with the completed ballot representing such member's vote.

The ballot and the summary evaluation forms on *Your Mississippi* and *Mississippi: Conflict and Change* by committeeman

John M. Turnipseed, were introduced in evidence as Plaintiffs' Exhibit 14. A copy of this exhibit is attached as Appendix B and made a part of this Memorandum by reference.

Each committee member was required to submit similar documents.

Mr. Turnipseed's reason, as reflected by the summary evaluation form, for rejecting *Mississippi: Conflict and Change* was "It is my professional opinion that this book is 'unsuitable' for classroom use, therefore, I cannot recommend it in any manner".

Mr. Turnipseed's evaluation of the Bettersworth book *Your Mississippi*, was "average".

Mr. Riales rated *Your Mississippi* as "high". In regard to *Mississippi: Conflict and Change*, Riales rejected the book. He identified the content of the book considered objectionable to him as "page 96–Last Paragraph; page 178–Picture at the bottom of the page". In explaining the effect the objectionable content he assumed to have on the learner, he stated

This is only two examples of many in the book. Continuous coverage of isolated incidents of the mis-treatment (sic) of slaves and blacks by whites could easily lead the readers to believe that all slaves and blacks were treated in the same manner. I feel that this book is too racially orienated and does not concentrate sufficiently on the areas as suggested in the criteria.

Ms. Kyle did not give any reason on the summary evaluation form for *Mississippi: Conflict and Change* for her rejection of the book.

Ms. Wilder's only comment on her summary evaluation form for *Mississippi: Conflict and Change* was given in responding to the request that she identify the content considered objectionable. There she entered on the form "none applicable at this grade level".

Stating her reasons for rejecting *Mississippi: Conflict and Change*, Mrs. McElhaney, when requested to describe the effect that the objectionable content is assumed to have on the learner, stated:

I do not feel that the ideas concentrated on this text are expressed in terms of the junior high student. Perhaps for college level and mature adult. It also does not meet requirement as a textbook. Readability level too high. I do not feel that the overall content presents a true picture of the history of Miss. in terms of the prescribed course pre-requisite.

At trial, rating committee members advanced other reasons for rejecting *Mississippi: Conflict and Change*. As the trier of the facts, however, the court views the testimony of each member of the rating committee wherein reasons for rejection were given other than those reflected on the summary evaluation form, as an after-the-fact judgment.

The court feels that if the reasons given at trial to support the ballots of the five rating committee members in rejecting *Mississippi: Conflict and Change* other than those reflected by the summary evaluation forms, had been substantial and played an important role in the rejection, such reasons would have been inserted in the summary evaluation forms.

One reason for rejecting *Mississippi: Conflict and Change* given at trial was that the publisher did not furnish each rating member a teacher's edition, as required by the rules governing the submissions of textbooks.

The pretrial order provides:

"(7) *Mississippi: Conflict and Change* was submitted in accordance with all standards—procedural and technical—established by regulations promulgated by the State Textbook Purchasing Board." Pre-Trial Order, p. 4b.

The suggested criteria for Textbook Selection (Ex. P–7, p. 6) provides:

"5. Special Instructions: Teacher's manual should be available free—one for each 25 student books sold. These will be supplied from the depository. Hard back required."

This criterion does not require submission of a teacher's edition with the textbook submission. General Criterion 6 (Ex. P–7, p. 1) provides:

"6. Each text should either contain appropriate suggestions for teachers or be accompanied by a separate teacher's manual."

No notice is given that this requirement is mandatory; it is stated under the heading "*Suggested* Criteria for Textbook Selection" (emphasis added). Dr. Loewen testified that a draft teacher's edition was available at the time of the submission, that the publisher's representative, Mr. Herb Stanley, told him that he had informed rating committee members that a teacher's edition would be available if the book was adopted. Dr. Loewen also testified that a teacher's edition in final form (Ex. P–33) is available now. Mr. Turnipseed testified that Mr. Stanley told him that a teacher's edition would be available if the book was adopted.

Further, General Criterion 6 is phrased in the disjunctive; no teacher's manual is even necessary if the text contains "appropriate suggestions for teachers." The evidence in this case is clear that the textbook, *Mississippi: Conflict and Change*, contains numerous "appropriate suggestions for teachers." The book is filled with questions for class discussions (e. g., pp. 8, 13, 18, 21, 29, 61, 67, etc.), maps and other illustrations, definitions of terms used, special projects, suggestions for field trips, and, at the end of each chapter, an annotated bibliography. The rating committee members were unanimous in their testimony that the attitude of the publisher's representation in no way influenced their decision to reject the book.

The court finds that the failure of the publisher of *Mississippi: Conflict and Change* to furnish each rating committee member with a teacher's edition in final form, under the existing circumstances, did not contribute in a substantial way to its rejection.

The defendants introduced evidence questioning the value of *Mississippi: Conflict and Change* on several grounds, that is (1) the lack of proper emphasis in certain subjects; (2) readability and vocabulary; (3) organization of the text; and (4) pictures

and captions. The court finds that the evidence does not sustain defendants' position with regard to any of these issues.

Admittedly there were some errors in the captions given to some of the pictures portrayed in the book. This was admitted by the editors. The errors are easily correctible and were not such as to justify the rejection of the book.

The court concludes that the textbook *Mississippi: Conflict and Change* was not rejected for any justifiable reason. The textbook was submitted in accordance with all standards—procedural and technical—established by the regulations and promulgated by the Mississippi State Textbook Purchasing Board.

The Mississippi Statute, Section 37-43-21 expressly provides that:

"[i]t shall be the duty of said rating committees to appraise the books offered for adoption in each field in which textbooks are offered for adoption and recommend five books for each adoption to be made by the board and giving reasons for or basis of such recommendations".

Here the only textbooks in the course of Mississippi History for grade nine students submitted for approval to the committee were the Bettersworth textbook *Your Mississippi* and the Loewen-Sallis textbook *Mississippi: Conflict and Change*. Yet, the majority of the committee recommended only the one—*Your Mississippi*.

The rating committee's action deprived the Mississippi Public Grade schools and such private schools as may qualify for free textbooks, and the teachers and students in those schools, of having available as a course of study in Mississippi history the Loewen-Sallis textbook *Mississippi: Conflict and Change*.

The record reflects that from July 1, 1975 to July 1, 1978, the Mississippi State Textbook Purchasing Board had purchased and loaned to eligible pupils in the schools of the state a total of 33,605 of Bettersworth's *Your Mississippi*, and since July 1, 1978 an estimated number of additional copies of this book have been purchased and loaned by Mississippi Textbook Purchasing Board to eligible pupils.

On November 8, 1974, having learned through unofficial news reports that the constituent rating committee had rejected *Mississippi: Conflict and Change*, Dr. Loewen wrote a letter to defendant Matthews, Executive Secretary of the Purchasing Board, requesting information as to the reasons for the rejection. Mr. Matthews replied on November 15, 1974, expressing surprise in regard to the letter, stating that all the Textbook Board's official communications are made to publishing companies, and the first publication had been made to the publishers on November 4, 1974. Dr. Loewen was referred to his publishing company for further information.

Dr. Sallis and Miss Jean Middleton attended a meeting of the purchasing board on February 11, 1975 to plead the cause of *Mississippi: Conflict and Change*. Their presentation is reflected in plaintiffs' exhibit P-35. After the meeting adjourned, Mr. Mathews wrote them a letter in which he stated,

"Since the Board has no authority to conduct a formal hearing, no power to redirect committees to re-evaluate their ratings of textbooks, and no power to receive petitions relating thereto, the Board is returning all materials submitted by you at the meeting."

The State of Mississippi has foreclosed every avenue of approach for plaintiffs and the members of the class represented by them in the action sub judice to a hearing of any kind in which the merits of *Mississippi: Conflict and Change* can be presented. The matter is forever foreclosed—the decision of the rating committee stands without any avenue of challenge. The authors and editors of the book and the teachers, parents and pupils making up the plaintiffs' class have no way open to them to challenge the rating committee's action except by recourse to the courts of this country for redress of their grievances.

The evidence submitted by plaintiffs sustains the holding that such was the intention of the state legislature in the enact-

ment of the Textbook Chapter of the Code, Chapter 43, of Title 37, Miss.Code 1972. The Mississippi legislature does not record the legislative history of the enactment of its laws.

The only recorded evidence of the legislative intent capable of production are news items carried in the newspapers contemporaneously with the deliberations of the legislative bodies. These items are trustworthy and can be accepted as correct accounts of events occurring in the legislative halls. Documentary evidence of this type was introduced at trial and convinced the court that the legislative intent was to create a statutory procedure which would vest in the hands of the Governor and Superintendent of Education of the State the power to control the destiny of any textbook offered for adoption by the State Purchasing Board. The intended purpose was accomplished in the case of *Mississippi : Conflict and Change*.

The context in which this statutory procedure was created, as evidenced by the newspaper clippings introduced at trial, clearly reveals an intent on the part of the legislature to eliminate allegedly controversial material from the schools' curriculum, and to insure that only the views of those in authority would be communicated to school children. In 1960, for example, when the present statutory mechanism for the selection of rating committee members was adopted, the Governor of the state supported the bill with these words:

> Failure of the House to act favorable upon this bill will, I very much fear, hamper our efforts to clean up our public school textbooks and give our children the instruction material they must have if they are to be properly informed of the Southern and true American way of life.

Ex. P–61. Earlier legislative history of the passage of the first free textbook law reveals an even more adamant intent on the part of the legislature to insure that textbook selection reflected the predominant racial attitudes of the day. *See*, Ex. P–61. The court finds that the statutory procedure regarding textbook approval was es-

tablished so that the Governor and Superintendent of Education could control, without responsibility to a higher authority, the textbooks selected for use in Mississippi schools, and thereby influence the schools' curriculum. This purpose was insured success by the lack of recourse given to those adversely affected by a rating committee's decision.

The court has previously found that the textbook *Mississippi : Conflict and Change*, was not rejected for any justifiable reason. Further analysis of the evidence presented reveals that the rejection of this textbook was motivated and influenced by racial issues. The evidence shows that Mr. Riales considered the book to be "too racially oriented." Mrs. McElhaney stated that "the overall content" of the book did not present "a true picture of the history of Mississippi." Of course, these views are only those of two committee members. The other members either did not elaborate on their reasons for rejection, or gave no reasons at all. The court finds, however, that the evidence is sufficient to conclude that the treatment which the book gave to controversial racial issues was a factor which led to its rejection. Based upon the suggested criteria for textbook selection, the court finds that this controversial treatment of racial issues was not a justifiable reason for rejection by the committee.

The evidence also reveals that the textbook *Mississippi: Conflict and Change*, received a number of favorable reviews and comments in scholarly publications related to educational issues. One study compared the two textbooks considered by the rating committee and concluded that "By any reasonable criteria, including those used by the Mississippi review committee, *Conflict and Change* is not only eligible for adoption, but is far superior in format and content to all history textbooks we have seen". Ex. P–52. In addition, correspondence to the editors from faculty members at several prominent universities reveals that the book was favorably received in academic circles. Ex. P–26. While this evidence does not indicate that the criteria used by the textbook com-

mittee were necessarily incorrect, it does indicate that the textbook met certain other criteria in the academic community. This leads the court to find that other, nonjustifiable factors influenced the committee's rejection of the textbook.

## II. Conclusions of Law.

### A. Standing to Sue.

Before proceeding to the merits of this action, the court must first address itself to the defendants' contention that plaintiffs lack standing to pursue this action, in that they have failed to show the deprivation of a "legally cognizable right". The court notes that this preliminary objection is usually raised in cases which present novel constitutional issues, perhaps because the question of standing "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343, 354 (1975). The court is not convinced, however, that the issues in this case are particularly novel ones, or that the action extends beyond the court's proper societal role. To put it as simply as possible, the plaintiffs allege that the defendants' conduct deprived them of certain fundamental rights which are constitutionally guaranteed. On that basis, they assert that they have a direct interest in the outcome of this litigation, an interest which entitles them "to have the court decide the merits of the dispute . . .." *Warth v. Seldin*, 422 U.S. at 498, 95 S.Ct. at 2205, 45 L.Ed.2d at 354.

■ The requisite standing to maintain an action can only be "demonstrated by a plaintiff who has a personal interest in the outcome of the controversy, . . ." *Finch v. Mississippi State Medical Ass'n. Inc.*, 585 F.2d 765, 771 (5th Cir. 1978). This question of "personal interest" or "personal stake" in the outcome is generally determined through the analysis of two separate requirements: (1) whether or not there has been an "injury in fact"; and (2) whether or not "the interest sought to be protected is arguably within the zone of interests to be protected or regulated by the statute or

constitutional guarantee in question." *United States v. Gurney*, 558 F.2d 1202, 1206 (5th Cir.), *rehearing denied*, 562 F.2d 1257 (1977), *cert. denied sub. nom.*, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978). The first requirement or criterion relates directly to whether or not the plaintiff's interest is sufficient to meet the jurisdictional requirement that the action be a "case of controversy." *See Singleton v. Wulff*, 428 U.S. 106, 112–113, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826, 832 (1976). The second requirement as interpreted most recently by the Supreme Court, is actually a question of causation. In other words, there must be "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595, 610 (1978). *See also, Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). This court must determine, therefore, whether the plaintiffs have alleged sufficient "injury in fact", and whether there is some "causal connection" between the injury and the regulatory procedure which plaintiffs challenge.

■ In making this analysis, however, the court notes that it does not pass on the merits of the action at this point. Bearing in mind the distinction between standing and the merits of a particular cause of action, *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846, 859 n.18 (1979), the court finds that the plaintiffs have alleged a sufficient injury or personal stake "that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450, 460 (1976). It is arguable that the plaintiffs have suffered an injury as the result of the impairment of their constitutional rights to freedom of speech and freedom of the press. As for the plaintiffs Loewen and Sallis, the editors of the textbook, the committee's action has effectively prevented the distribution of the book within Mississippi. A find-

ing that the state's regulation impairs sales or distribution is sufficient to confer standing on those adversely affected. *Bantam Books v. Sullivan*, 372 U.S. 58, 64 n.6, 83 S.Ct. 631, 636 n.6, 9 L.Ed.2d 584, 589 (1963). Similarly, to the extent that the state's authority to regulate local curricula may be subject to constitutional restraints, the plaintiff school district, school superintendents and teachers may assert their first amendment rights to protect academic freedom. Any restraint on that freedom is a palpable injury for which they may seek redress. *See Parducci v. Rutland*, 316 F.Supp. 352 (M.D.Ala.1970), *citing Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957). The plaintiff students and parents also have protected rights under the first amendment to receive useful information and to have a voice in the direction of a student's education. *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1924); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Right to Read Defense Committee of Chelsea v. School Committee*, 454 F.Supp. 703 (D.Mass.1978).

As to the second prong of the standing issue, the plaintiffs have also alleged a sufficiently "traceable" causal connection between the purported injury to their protected rights, and the defendants' conduct. To borrow a phrase from the law of torts, the defendants' conduct is the *sine qua non* of the alleged injury; but for the rejection of the Loewen and Sallis textbook, the plaintiffs would not be "proper proponents of the particular legal rights on which they base their suit." *Singleton v. Wulff*, 428 U.S. 106, at 112–113, 96 S.Ct. 2868, at 2873, 49 L.Ed.2d 826, at 832 (1976). The court concludes, therefore, that the plaintiffs have alleged a sufficient personal stake in the outcome of the controversy, and that they are entitled to have this court decide the merits of their dispute.

B. *Plaintiffs' Cause of Action: 42 U.S.C. §§ 1981, 1983.*

The plaintiffs claim that the action of the rating committee in refusing to recommend *Mississippi: Conflict and Change*, and the action of the Board in ratifying that decision, deprived the plaintiffs of their rights secured by the First, Thirteenth, and Fourteenth Amendments to the Constitution. For such violations of these guaranteed rights, a cause of action has been created in 42 U.S.C. § 1983, and this court has jurisdiction to hear such a claim pursuant to 28 U.S.C. § 1343(3) & (4). Of course, not every action by state officials which adversely affects a person's interests will give rise to a cause of action under § 1983. The "state action" required by the section must rise to the level of a violation of *specific* constitutional guarantees. *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214, *rehearing denied*, 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975). The prerequisites to liability under § 1983 are twofold: (1) The plaintiff must prove that the defendant deprived him of his rights secured by either the Constitution or the laws of the United States; and (2) the plaintiff must prove that the defendant acted under color of state law. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Downing v. Arnold*, 461 F.Supp. 54 (D.N.H.1978); *Reilly v. Leonard*, 459 F.Supp. 291 (D.Conn.1978). It is not necessary that the plaintiff prove that the defendant acted with the specific intent to deprive plaintiff of his rights, for as the Supreme Court has stated, § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492, 505 (1961). Of course, in alleging under § 1983 that the defendant deprived the plaintiff of equal protection of the laws through racially discriminatory practices, the plaintiff must prove "discriminatory intent" on the part of the defendant. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Fifth Circuit, however, has reconciled these two cases with *Monroe* and has found that the two principles are not inconsistent:

[W]e do not read *Washington v. Davis* and *Arlington Heights* as banishing from the law of racial and ethnic discrimination that venerable common law tort principle that a person intends the natural and foreseeable consequences of his actions. When the official actions challenged as discriminatory include acts and decisions that do not have a firm basis in well accepted and historically sound nondiscriminatory social policy, discriminatory intent may be inferred from the fact that those acts had foreseeable discriminatory consequences.

*United States v. Texas Education Agency,* 564 F.2d 162, 168 (5th Cir. 1977).

■ An action brought under § 1981 is essentially one for the redress of a tort, although the relief available under that section is somewhat more limited than that available under § 1983. *Campbell v. Gadsden County District School Board,* 534 F.2d 650, 654 n.8 (5th Cir. 1976). Section 1981 provides, in pertinent part, that "All persons . . . shall have the same right in every State . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." It is clear that the section provides relief for racial discrimination, and discriminatory intent under the standard of *Arlington Heights* is a necessary element.

■ The proper defendant under the Civil Rights statutes is one who acts under color of state law, although an action for damages does not extend to the state itself. In *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Supreme Court "reaffirmed the rule that had evolved in . . . earlier cases that a suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358, 364 (1979). The defendants in the action sub judice submit that the State Textbook Purchasing Board, as an agency of the state, comes within the

general rule and should therefore be dismissed. It is true that a suit against the state and its agencies is barred unless the state waives its sovereign immunity, *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978), but it is also true that "a federal court, consistent with the Eleventh Amendment may enjoin state officials to conform their future conduct to the requirements of federal law, even though an injunction may have an ancillary effect on the state treasury." *Quern v. Jordan,* 440 U.S. at 337, 99 S.Ct. at 1143, 59 L.Ed.2d at 364, *citing Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The members of the Board, therefore, may be sued in their individual and official capacities; merely "[s]triking the state's name from the list of parties will have no impact on the effectiveness of [the] relief." *Alabama v. Pugh,* 438 U.S. at 783, 98 S.Ct. at 3058, 57 L.Ed.2d at 1117 (Stevens, J., dissenting). The court notes that plaintiffs do not seek damages in this cause; they ask for prospective injunctive and declaratory relief only. Even though such relief "may have an ancillary effect on the state treasury", the court concludes that the plaintiffs' action against the individual defendants is not barred by the Eleventh Amendment.

C. *Denial of First Amendment Rights and Due Process.*

The field of education is one which needs particular constitutional protection. This is so because educational issues such as academic freedom are fundamentally linked with First Amendment guarantees. In this case, the plaintiffs' First Amendment rights are affected not only in the educational area, but also in the area of circulation and distribution of published material. For the following reasons, the court concludes that the defendants have impermissibly abridged the plaintiffs' rights under the First Amendment.

■ The primary issue here is whether or not, given the accepted principle that curriculum choice is a matter of local educational concern, state officials may have un-

fettered authority to decide which books children may read in school, without providing for a method by which those affected by such decisions may oppose them. This court concludes that such authority does not and cannot exist. As the Supreme Court concluded in *Bantam Books v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584, 593 (1963), "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." This court must apply the same standard here.

A comparison of the facts in *Bantam Books* with the facts in this case, shows a striking similarity. In *Bantam Books*, the state legislature created the Rhode Island Commission to Encourage Morality in Youth, and charged the commission members "to educate the public concerning any book . . . containing obscene, indecent or impure language . . . ." *Id.* at 59, 83 S.Ct. at 633, 9 L.Ed.2d at 587. In the case at bar, the state legislature created a statutory scheme for the appointment of textbook approval committees, and the court has found that the avowed purpose of such a scheme was to insure that no unauthorized ideas crept into the classroom. In *Bantam Books*, the State commission would notify book distributors within the state that certain books were determined to be obscene and therefore objectionable for sale to minors. The notice would also remind the distributor of the commission's duty to recommend prosecution to the state attorney general. The statutory scheme in this action is not quite as harsh: the committee merely approves those books to be purchased with state funds, and those not approved may not be so purchased. As a result, they are not used in the schools. The Supreme Court concluded in *Bantam Books* that the acts and practices of the state commission effectively foreclosed the circulation and distribution of the offensive books throughout the state. The same may be said in this case, where the state formally places its seal of approval upon a particular book and denies its approval to another book, without providing for a method of review. The commission's practice in *Ban-*

*tam Books* was struck down because it provided "no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter." 372 U.S. at 70, 83 S.Ct. at 639, 9 L.Ed.2d at 593. This court has found that the regulatory scheme in this case forecloses the committee's decision from further review, without giving those adversely affected by it a voice in the matter. This procedure is objectionable, not because it regulates, but because it regulates *unreasonably*.

The Supreme Court has stated previously that state and local control over public education may not be completely unfettered:

> Our courts . . . have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief. By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate constitutional values. On the other hand . . . the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom."

*Epperson v. Arkansas*, 393 U.S. 97, 104–05, 89 S.Ct. 266, 270, 21 L.Ed.2d 228, 234 (1968), *quoting Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629, 640 (1967). The court is persuaded to intervene in this conflict precisely because this is a case which "directly and sharply" implicates constitutional values. It does so because the defendants have provided no method by which the plaintiffs may safeguard their First Amendment freedoms. All interested parties, whether they be textbook editors, teachers, parents, or students, have a fundamental interest in maintaining a free and open educational system that provides for the acquisition of useful knowledge. *See Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

■ Obviously, there is no specific language in the First Amendment which cre-

ates a freedom to teach any subject at all. As one court observed, however,

The First Amendment references to freedom of speech and of the press are designed to assure the free exchange in the general marketplace of ideas. Academic freedom, it can be argued, is the adaptation of those specific constitutional rights to protect communication in the classroom as a special market place of ideas.

*Cary v. Board of Education*, 427 F.Supp. 945, 949 (D.Colo.1977). To the extent that the decisions of the textbook committee impinge upon a teacher's free choice of curriculum, or upon an editor's right to distribute his book, or upon a student's right to obtain an education, there must be some method by which uninhibited governmental control over "the free exchange" of ideas can be checked. There is no such method here. In *Sterzing v. Fort Bend Independent School District*, 376 F.Supp. 657, 661 (S.D.Tex. 1972), the court held that the "freedom of speech of a teacher . . . must not be so lightly regarded that he stands in jeopardy of dismissal for raising controversial issues in an eager but disciplined classroom." By the same token, the First Amendment freedoms of all interested parties should not be completely disregarded by those persons, acting under color of state law, who make curriculum decisions from which there is no appeal. It is "the binding duty of an administrative body to act with full information, with reason and deliberation, and with full benefit of the views of supervisors, principals and others familiar with the curriculum and teaching techniques in the schools . . . ." 376 F.Supp. at 661. No less should be required here, where the defendants' actions have the potential for denying to the plaintiffs valuable governmental benefits. Procedures must be instituted which insure that these benefits are not denied on a basis which infringes constitutionally protected interests. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

██ The court concludes, therefore, that the defendants have deprived the plaintiffs, under color of state law, of their constitutionally protected rights of freedom of speech and of the press, and of their rights to due process of law under the Fourteenth Amendment. 42 U.S.C. § 1983.

### D. *Racially Discriminatory Rejection and Intent to Dismiss.*

██ It has been held by this court and by the Fifth Circuit Court of Appeals that those acting under color of state law may not act to censor a publication simply because it contains controversial viewpoints. *Bazaar v. Fortune*, 476 F.2d 570 (5th Cir. 1973); *Burnside v. Byars*, 363 F.2d 744 (5th Cir. 1966). The court has concluded that the committee's rejection of *Mississippi: Conflict and Change*, while not constituting censorship *per se*, was certainly an impermissible rejection because the procedure violated the plaintiffs' constitutional rights. The court concludes that the rejection of the book for the reasons given evidences a racially discriminatory purpose on the part of the defendants.

The court has found that the textbook was not rejected for any justifiable reason. The lack of a justifiable reason is not in and of itself a constitutional violation. However, the court has also found that the racial issues substantially influenced the committee in its decision. That finding, coupled with the finding that the legislative history suggests an intent to perpetuate ideas of segregation and discrimination, leads this court to conclude that the requisite "discriminatory intent" has been demonstrated. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

Under the standard of *Arlington Heights*, it is only necessary for the plaintiffs to prove "that a discriminatory purpose has been a motivating factor in the decision" to reject the textbook. Id. at 265–66, 97 S.Ct. at 563, 50 L.Ed.2d at 465. The court also suggested several "evidentiary sources" from which such proof may be drawn. Several factors lead this court to conclude that the plaintiffs have sustained their burden. First, the reasons given by some committee

members for rejecting the textbook indicate that race was a motivating factor. These statements, set forth in the court's findings of fact, need not be repeated here, but they indicate without question that some members were influenced by racial issues. Secondly, those members who did not indicate that race influenced them in their decision, also did not indicate any other reason. This appears to be a violation of the committee's statutory duty to state the reasons for its recommendation. Miss.Code Ann. § 37–43–21 (1972). A failure to do so is clearly a departure from the "normal procedural sequence", a factor "which might afford evidence that improper purposes are playing a role." 429 U.S. at 267, 97 S.Ct. at 564, 50 L.Ed.2d at 466. Thirdly, as the court has previously indicated, the legislative history and background of the textbook statutes also demonstrates racially discriminatory policies as a motivating factor. Because this legislation does not have "a firm basis in well accepted and historically sound non-discriminatory social policy," the court concludes that those charged with carrying out this legislation may be determined to have foreseen the discriminatory consequences of their actions. *United States v. Texas Education Agency*, 564 F.2d 162, 168 (5th Cir. 1977). The plaintiffs have therefore demonstrated the requisite discriminatory intent necessary for a cause of action under the Civil Rights statutes.

E. *Conclusion: Appropriate Remedy.*

█ Plaintiffs would have this court find that the textbook which was approved is a "symbol of resistance to integration in Mississippi schools," and that its approval over the Loewen and Sallis text was an unlawful perpetuation of racial discrimination. The court will not make any such finding. Having concluded that the principles of free speech embodied in the concept of academic freedom warrant protection, the court cannot now place the judicial seal of approval on the ideas found in one book, and denigrate the ideas found in another. To do so would violate the same constitutional principles which the court now seeks to protect.

The court concludes that the manner in which *Mississippi: Conflict and Change* was rejected by the defendants violated the plaintiffs' rights guaranteed by the First and Fourteenth Amendments. The court also concludes that the rejection of *Mississippi: Conflict and Change* was unjustified and motivated by reasons which the defendants should have known would have racially discriminatory consequences.

The only method by which the court can assure that these plaintiffs' constitutional interests are protected in this action is to enjoin the defendants to approve *Mississippi: Conflict and Change*, placing it on the state-approved list for purchase and distribution to students in eligible schools. The defendants and their successors will be required to approve the textbook, after the plaintiffs have had a reasonable time period within which to submit proposed revisions and corrections to the book. Any objections which the defendants may have to the proposed revisions must be based upon objective criteria contained in the Board's *Suggested Criteria for Textbook Selection.*

Plaintiffs also request this court to enjoin the defendants to implement procedures consistent with the requirements of due process, in the approval or rejection of textbooks. It must be kept in mind that the plaintiffs do not submit, and this court does not hold, that the statute relating to textbook approval committees is unconstitutional. The question here is whether the court may properly order the defendants to implement broad changes in the procedure for approval of textbooks without requiring the defendants, in effect, to violate the statute. It is not clear from the language of the statute, for example, whether or not all committee members are required to state the reasons for their individual decisions. Nor is it clear under the existing statutory scheme that the Purchasing Board would have the power or authority to conduct *de novo* hearings in a review of the committee's actions. Given the language of the statute, the court could not possibly require the promulgation of far reaching regulations without also giving the legislature the

opportunity to correct the statute. The court declines to institute such a practice.

Given the accepted principle that the equitable power of this court to remedy past wrongs is quite broad, it is also true that the "nature of the violation determines the scope of the remedy." *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, 567 (1971). Even though the violations in the instant case are those involving due process, which under most circumstances would require procedural changes, the violations have occurred at the state level. In addressing the scope of a district court's equitable power, the Supreme Court has stated that the court should keep in mind "important considerations of federalism." *Rizzo v. Goode*, 423 U.S. 362, 378, 96 S.Ct. 598, 607, 46 L.Ed.2d 561, 573 (1976). In situations where "the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" 423 U.S. at 378, 96 S.Ct. at 607, 46 L.Ed.2d at 573, *quoting Stefanelli v. Minard*, 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138, 142 (1951).

If the court were to mandate the revision of textbook approval procedures, it would not be giving due consideration to the principles of federalism in this particular case. The plaintiffs have challenged the rejection of one book only; the defendants consider literally hundreds of books, utilizing the existing procedure. The remedial relief which the plaintiffs will be granted will make them whole, and the particular violation in this case does not necessitate a broader remedy. The court should not undertake to dictate to the defendants a plan of textbook approval. Underlying notions of federalism do not allow the court to supervise state administrative proceedings. Having placed these particular plaintiffs in a position which will remedy the particular violations of due process committed against them, the court will not extend its equitable powers further.

The court concludes that the plaintiffs, in addition to the injunctive relief, are entitled to recover their costs of the action from the defendants. Additionally, the plaintiffs, as prevailing parties in this litigation, are entitled to an award of reasonable attorney's fees as part of the costs. 42 U.S.C. § 1988. The plaintiffs shall, within 30 days of this decision, submit an itemization of fees and expenses, supported by appropriate affidavits of counsel. The defendants shall have 20 days thereafter to submit any objections to plaintiffs' itemization.

APPENDIX "A"

§ 37-43-3: Mississippi State Textbook Purchasing Board established.

There is hereby established the Mississippi State Textbook Purchasing Board, which shall hereinafter be referred to in this chapter as the board. Said board shall consist of the governor who shall be ex-officio chairman, the state superintendent of public education, and three members to be appointed by the governor, one from each of the three supreme court districts, who shall serve for a period of four years. In case of a vacancy during the term of an appointed member, the governor shall appoint a member to fill only the unexpired term. Each appointed member of the board shall be an educator of known character and acknowledged ability in his or her profession, with at least five years of successful teaching or supervisory experience in the public schools of Mississippi immediately previous to his or her appointment. In addition thereto, each appointed member shall be a qualified elector of his or her supreme court district. He or she shall be at least thirty years old.

§ 37-43-5: Election of executive secretary.

The board, at its first meeting, shall elect an executive secretary of proven business ability, whose duty it shall be to keep the minutes of the board, a complete record of all the proceedings of the board, and to keep, file and preserve all documents, papers and records of the board. Said executive secretary shall perform such other duties as may be prescribed by the board. Said executive secretary shall enter into

bond in the sum of $10,000.00 payable to the State of Mississippi, conditioned upon the faithful performance of his duties, and the proper and accurate accounting for all funds of every nature that may come into his hands or under his control under the provisions of this chapter.

### § 37–43–19: Powers and duties of the board.

The board shall have the power and is hereby authorized:

(a) To promulgate rules and regulations for the purchase, care, use, disposal, distribution, and accounting for all books to be furnished under the terms of this chapter, and to promulgate such other rules and regulations as may be necessary for the proper administration of this chapter.

(b) To adopt, contract for, and purchase, cash or credit basal textbooks through twelve grades as provided in the school curriculum, or for any other course that it may add thereto.

(c) To determine the period of contract for rated and adopted textbooks which shall not be for less than four years nor more than five years, with the right of the board in its discretion to renew or extend such contract from year to year for a period not exceeding two additional years, and to determine the conditions of the approval or forfeiture of a contract and such other terms and conditions as may be necessary and not contrary to law. No contract shall be valid and binding until and unless approved by the Governor.

(d) To have complete power and authority over additions and amendments to textbooks, advertising for bids and the contents thereof, advertising on the protective covers of textbooks, bids and proposals, prices of textbooks, specimen copies, cash deposits, selection and adoption, distribution, fumigation, emergencies, selling to others, return of deposits, forfeiture of deposits, regulations governing deposits, renovation and repair of books, requisition, transportation or shipment of books, and any other acts or regulations not contrary to law, that may be deemed necessary for furnishing and loaning free textbooks to the school children, as provided in this chapter.

### § 37–43–21: Textbook rating committees.

For the purpose of assisting the board during an adoption, there shall be rating committees in each of the fields in which textbooks are considered for adoption. Each committee shall be composed of seven members. The State Superintendent of Public Education shall appoint three members of each of the committees, each of whom shall be a competent, experienced teacher or supervisor of instruction professionally trained in each of the fields in which textbooks are considered for adoption. The Governor of the State of Mississippi thereupon shall appoint four members of each of said committees who shall be persons he deems competent to participate in the appraisal of books offered for adoption, in each field, for use in the public schools of this State.

It shall be the duty of said rating committees to appraise the books offered for adoption and recommend three books for each adoption to be made by the board and giving the reasons for or basis of such recommendations. No book shall be recommended which does not receive a majority vote of the members of each committee. Any member dissenting from any majority vote of the committee shall make his appraisal of any book recommended or rejected by the majority of the committee and specify the reasons therefor and make such recommendations as he thinks proper. All appraisals, recommendations, and dissents, if any, shall be in writing and filed with the board for its consideration upon the adoption. The expenses of such committees shall be paid out of the State textbook fund. Such rating committees shall be subject to the regulations set forth in sections 37–43–7, 37–43–9, 37–43–13, to 37–43–17. The board shall have the power to reject any and all recommendations of the rating committees and to call for further recommendations; in no case shall the board adopt any book not recommended by the rating committees.

Any and all textbooks that may be furnished by the publisher thereof to any member of the rating committee without cost shall within one year after receipt of same by said member be turned in to the State school book depository without any cost to the State of Mississippi, and the same shall thereafter be used without any cost to the State of Mississippi in supplying free textbooks to the educable children of the State of Mississippi as now provided by law.

### § 37–43–31: Selection of books by local school districts.

The board shall adopt and furnish textbooks only for use in those courses set up in the State course of study adopted by the State board of education, or courses established by special acts of the legislature. In all subjects the board, in its discretion, may adopt five textbooks from those recommended by the textbook rating committees. The board may adopt a plan which permits the local school districts to choose the book or books to be requisitioned from those adopted, provided:

(a) That, in selecting readers, the local school district may be allowed to adopt two from which each pupil enrolled may be furnished the equivalent of two in such proportions as desired;

(b) That, in selecting books for all other subjects, the local school district may be allowed to select any adopted state textbook without being restricted to a single declared adoption when the governing authority of the district declares a policy of multiple adoptions and specifies the subject areas therefor; not more than one of the books from the multiple adoption list shall be furnished to each pupil enrolled in a course;

(c) That, when a book is furnished by the State, it shall remain in use during the period of its adoption;

(d) That school officials of separate school districts and of each system of county schools shall select the same book or books for all of its schools;

(e) That the average per pupil cost of textbooks so furnished any unit shall not exceed that allowed for all other units in the State; and

(f) That nothing herein provided shall be construed as giving any school the authority to discard or replace usable copies of textbooks now being furnished by the State.

Whenever any book under contract is displaced by a new adopted, the board may continue to require the schools to sue such books until the stock owned by the States is exhausted; however, the period of use shall not exceed four years.

It should be noted that the provision of the first sentence of the second paragraph of § 37–43–21, relating to the recommendation by the rating committees of three books for each adoption to be made by the board, is a typographical error, and the actual terms of the law provide for the recommendation of five (5) books for each adoption.

### APPENDIX B

MISSISSIPPI STATE TEXTBOOK
PURCHASING BOARD
P. O. Box 1075
JACKSON, MISS.

Subject Field ___ SOCIAL STUDIES, CAREER, HUMAN. 7–9

Course ___ Miss. History

Grade ___ 9

#### RATING COMMITTEE REPORT
(Individual)

Note: This report should be mailed to the executive secretary of the State Textbook Purchasing Board on or before the date previously specified by the Board.

If sufficient material is available, rate 8 books in the order 1st, 2nd, 3rd, 4th, 5th, 6th, 7th, and 8th.

___ Mississippi: Conflict & Change Random House

/ Your Mississippi Steck-Vaughn

## CERTIFICATE

I hereby certify that this report represents my individual recommendations after appraising all books offered for adoption as required by the Mississippi Textbook Law, and submit it as a part of the records of the State Textbook Board.

Date received_____ Signed _John M. Turnipseed_

Secretary_____ Date Submitted ___10-27___

(Return with your ratings) Date _10-20-74_

Evaluator _John M. Turnipsee_

MISSISSIPPI STATE TEXTBOOK PURCHASING BOARD
SUMMARY EVALUATION FORM

(A-D information on proposal form - Publisher's Statement of submission being considered.)

A. COURSE TITLE ___Mississippi History___

B. SUBMISSION TITLE ___Your Mississippi___

C. PUBLISHER ___Steck-Vaughn___

D. GRADE ___9___

E. ABILITY LEVEL: ____ HIGH ____ AVERAGE _✓_ LOW ____

(F 1-5 information in the suggested criteria for the subject area and course title for which submission is being considered.)

F. Please give the ratings of the submissions on a five point scale, as follows, indicating the degree to which it meets the suggested criteria. 5 - Excellent 4 - Above Average 3 - Average 2 - Below Average 1 - Very Low NA Not Applicable

1. Special Nature of Submission:

 ____5's _✓_4's ____3's ____2's ____1's ____NA's

2. Desired Approach of Content:

 ____5's _✓_4's ____3's ____2's ____1's ____NA's

3. Major Emphasis to be covered:

 _✓_5's ____4's ____3's ____2's ____1's ____NA's

4. Level at which submission will be used:

 ____5's _✓_4's ____3's ____2's ____1's ____NA's

5. Special Instructions:

 _✓_5's ____4's ____3's ____2's ____1's ____NA's

G. Please indicate specific objections to the submission as follows:

1. Identify the content considered objectionable (page and line if applicable) _____

_____

_____

2. Briefly describe the effect that the objectionable content. is assumed to have on the learner: _____

_____

_____

3. Give the specific documented source material that presents correct fact when objection is based upon error of fact in the submission. _____

_____

_____

NUMBER OF SUBMISSIONS FOR THIS COURSE TITLE EVALUATED BY THIS COMMITTEE_____.

(Return with your ratings) Date _10-20-74_

 Evaluator _John M. Turnipseed_

MISSISSIPPI STATE TEXTBOOK PURCHASING BOARD
SUMMARY EVALUATION FORM

(A-D *information on proposal. form - Publisher's Statement of submission being considered.*)

A. COURSE TITLE_____

B. SUBMISSION TITLE _Mississippi: Conflict & Change_

C. PUBLISHER_____

D. GRADE _____ _9_____

E. ABILITY LEVEL:_____HIGH_____AVERAGE_____LOW_____

(F *1-5 information in the suggested criteria for the subject area and course title for which submission is being considered.*)

F. Please give the ratings of the submissions on a five point scale, as follows, indicating the degree to which it meets the suggested criteria. 5 - Excellent 4 - Above .Average 3 - Average 2 - Below Average 1 - Very Low NA Not Applicable.

1. Special Nature of Submission:

 _____5's _____4's _____3's_____2's_____1's_____NA's

2. Desired Approach of Content:

 _____5's _____4's _____3's _____2's _____1's _____NA's

3. Major Emphasis to be covered:

 _____5's _____4's _____3's _____2's _____1's _____NA's

4. Level at which submission will.be used:

 _____5's _____4's _____3's _____2's _____1's _____NA's

5. Special Instructions:

_____ 5's _____ 4's _____ 3's _____ 2's _____ 1's _____ NA's

G. Please indicate specific objections to the submission as follows:

1. Identify the content considered objectionable (page and line if applicable) *It is my professional opinion that this book is "un-suitable" for classroom use,*

2. Briefly describe the effect that the objectionable content assumed to have on the learner: *Therefore I cannot recommend it in any manner.*

3. Give the specific documented source material that presents correct fact when objection is based upon error of fact in the submission. _____

_____

_____

NUMBER OF SUBMISSIONS FOR THIS COURSE TITLE EVALUATED BY THIS COMMITTEE _____ ___.