Michael SHECK, et al., Plaintiffs,

v.

BAILEYVILLE SCHOOL COMMITTEE, et al., Defendants.

Civ. No. 81–0153–B.

United States District Court,
D. Maine.

Jan. 22, 1982.

---

Ronald R. Coles, Carletta M. Smith, Machias, Maine, for plaintiffs.

Francis A. Brown, Daniel L. Lacasse, Calais, Maine, for defendants.

## MEMORANDUM DECISION

CYR, District Judge.

The present civil rights action challenges the constitutionality of the banning of the

book *365 Days* from the Woodland High School library by the Baileyville School Committee. The plaintiffs, students and parents of students, seek declaratory and injunctive relief restoring the book to the library shelves. The present ruling is restricted to a determination of the appropriateness of preliminary injunctive relief pending further proceedings and a final decision on the merits.

## I.

### FACTS

*365 Days* by Ronald J. Glasser [the book], a compilation of nonfictional Vietnam War accounts by American combat soldiers, was acquired by the Woodland High School library [1] [library] in 1971. During the ensuing decade the book was checked out of the library on thirty-two occasions before being banned by the Baileyville School Committee [Committee] on April 28, 1981. It was last checked out by the 15-year-old daughter of the defendant Mrs. Mary Davenport.

A friend informed Mrs. Davenport that her daughter had obtained the book from the library and that it contained objectionable language.[2] Mr. and Mrs. Davenport promptly secured the book from their daughter and, on April 23, 1981, showed some of its objectionable language to defendant Thomas Golden, Committee chairperson,[3] demanding that the book be removed from the library. The Davenports then complained to the librarian and to defendant Raymond Freve, school superintendent. Freve photocopied Chapter 8 and

advised the Davenports that their complaint would be considered at the next Committee meeting on April 28. In advance of that meeting, the Davenports informed Committee member Clifford McPhee of their complaint.

The April 28 meeting agenda, available to Committee members at noon that day, simply noted "Mr. & Mrs. Davenport," but there is no evidence that any of the three remaining Committee members, Susan White, Xavier Romero and Stephen Neale, a defendant, became aware of the subject matter of the "Davenport" agenda item prior to the meeting.

At the April 28 meeting, the Davenports, who had scanned the book for objectionable language, urged that it be banned. Superintendent Freve presented the Committee with a photocopy of the text and title of Chapter 8 in which 'the word' and other objectionable language appears more prominently than in other chapters. Freve related excerpts from uniformly favorable book reviews made available by the librarian, who was invited but chose not to appear before the Committee. The Committee briefly discussed the book and the reviews, then voted 5 to 0 to remove *365 Days* from the library. None of the principal participants in the process, including the Davenports, the superintendent and the Committee members, read the book before it was banned.

Sometime after the April 28 meeting, plaintiff Michael Sheck, then a Woodland High School senior, having previously read the book and being strongly opposed to its

---

1. The Woodland High School library serves both junior high school and high school students. Elementary school students and Baileyville townspeople may, but seldom do, use the library.

2. The book contains coarse language consisting principally of expletives devoid of prurient connotation. 'The word,' an Anglo Saxon "f" word, immediately became the focal concern in the dirty-word debate over the appropriateness of retaining the book in the school library. A number of "s," "p," and "b" words, as counsel have referred to them, as well as profane uses of "Jesus Christ" and "God," were likewise cited as objectionable.

3. The five-member Committee is an administrative arm of the Town of Baileyville which is responsible for the operation of Woodland High School pursuant to 20 M.R.S.A. § 851. The Committee is the superintending school committee required by 20 M.R.S.A. § 471 in each municipality not included in a school administrative district. The Committee is elected at annual town meetings and is responsible for the management of town schools, the provision of "school books," and the custody and care of all school property. *See* 20 M.R.S.A. §§ 471, 473(1), 856 & 857.

removal, brought a copy of *365 Days* to school as a means of protesting and promoting student discussion of the ban. The high school principal informed Sheck that possession of the book on school property would result in its confiscation. The high school principal and the superintendent testified that the Committee ban constituted a prohibition against its possession anywhere on school property, including school buses. No countervailing evidence was offered.

At the May 5 Committee meeting, Sheck and a fellow student presented views in opposition to the ban. No Committee action was taken and the ban remained in effect. On May 14, the Woodland High School Student Council formally requested that the Committee return the book to the library. On May 19, a motion to place *365 Days* on a restricted shelf, enabling student access absent parental objection, failed to carry, with the three Committee defendants, Golden, McPhee and Neale, opposing the motion. On June 17, the Committee voted [3–2] to place *365 Days* on a restricted shelf pending development and adoption of a challenged material policy. The book thereupon became available to students with parental permission, but the record is silent as to whether student access to the school library was possible during the summer recess.

The Committee developed a challenged material policy during the summer. The 'Baileyville School Department Challenged Material Policy'[4] became effective immedi-

---

4. *Baileyville School Department Challenged Material Policy.*

I. A review committee of at least seven members, consisting of
(1) Administrator
(2) Student
(2) Lay person
(2) Staff members

shall be appointed each year by the principal, subject to the approval of the superintendent and the school committee. It shall be the duty of this committee to review any book which has its appropriateness challenged and to complete the review within fifteen working days. No selected materials whose appropriateness is challenged shall be removed from the school except upon the written recommendation of this committee with the concurrance [sic] of the principal and superintendent, or by the school committee when a recommendation of a review committee is received. Access to questioned materials can be denied the student, if the parent desires so.

1. All complaints to staff members regarding any book shall be reported to the building principal involved, whether the complaint is by telephone, letter, or in personal conversation.

2. The building principal shall contact the complainant to discuss the complaint and attempt to resolve it informally.

3. If the complaint is not resolved informally, the complainant shall be supplied with a standard printed form which shall be completed and returned before consideration is given to the complaint.

4. If the principal does not receive the formal request consideration within two weeks, the complaint is considered closed.

If the completed form is returned, the reasons for selection of the specific work shall be established by the review committee.

Upon a receipt of a completed objection form, the principal will call a meeting of the review committee to consider the complaint.

The committee shall meet to discuss and evaluate the disputed material and shall prepare a written report on the material containing their recommendation or disposition of the matter.

II. The reconsideration committee shall:

a. Examine the challenged material.

b. Determine professional acceptance by reading critical reviews of the material.

c. Weigh values and faults and form opinions based on the material as a whole rather than on passages and sections taken out of context.

d. Discuss the challenged resource in the context of the educational program.

e. Extend invitation to discuss the challenged item with the individual questioner when appropriate.

f. Prepare a written report to the [sic] submitted to the Superintendent of Schools.

The principal shall notify the complainant of the decision. In answering the complainant, the principal shall explain how and why the book was selected, give the guidelines used in selection, and cite authorities used in reaching decisions. If the committee decides to retain the work that prompted the complaint, the complainant shall be given an explanation. If the complaint is judged valid, the principal will acknowledge it and make recommended changes.

If the complainant is still not satisfied, he/she may appeal to the Baileyville School Committee, through the superintendent, which shall make a final determination of the issue.

*Books for oral reports*: Each student is presented with a list of books for possible reading. If any student chooses a book containing subject matter which he considers improper, he should bring the material to the attention of his

ately upon its adoption on August 17, 1981 by unanimous Committee vote. The immediately ensuing motion to submit *365 Days* to the Baileyville School Department Challenged Material Policy failed by a vote of 2 to 3, with the Committee defendants McPhee, Golden and Neale in opposition. Superintendent Freve advocated defeat of the motion because of his belief that the earlier Committee ban would place too much pressure on the seven-member review committee charged with considering *365 Days* under the challenged material policy. Defendant Golden candidly stated that 'reconsideration' would serve no purpose, since the Committee had already decided to ban the book.

The Committee action of June 17 required that "... the book *365 Days* [be] placed on a restricted shelf—parental permission necessary prior to withdrawal—this above to be in effect until a 'Challenged Material Policy' is accepted." The August 17 Committee actions, adopting the Baileyville School Department Challenged Material Policy but declining to apply it to *365 Days*, reinstated the total ban adopted April 28, presently in effect.

Three Committee members, the defendant Golden, who supported the ban, and White and Romero, who opposed it, read the book before the August 17 reinstatement of the April 28 ban. The Committee defendants McPhee and Neale, who supported the ban, were aware of some of its objectionable language.

## II.

### PRELIMINARY LEGAL CONSIDERATIONS

*Jurisdiction.*

Original jurisdiction of the action [5] is conferred upon the United States district court by title 28 United States Code, section 1343(3). The complaint sufficiently alleges state action subjecting the student plaintiffs to actual deprivations of civil rights guaranteed by the First and Fourteenth Amendments to the Constitution of the United States. A justiciable controversy, ripe for the exercise of article III judicial power, arising under the Civil Rights Act and the first and fourteenth amendments, has been brought by student plaintiffs with standing.

*Venue.*

Venue lies in the District of Maine where all defendants reside and the action arose. 28 U.S.C. § 1391(b).

*Abstention.*

There are no unsettled questions of state law requiring clarification by the courts of the State of Maine, *see Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), nor are there pending or contemplated state judicial or administrative proceedings warranting abstention, *see Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

## III.

### PRELIMINARY INJUNCTIVE RELIEF

The court is to determine whether plaintiffs are entitled to preliminary injunctive relief pending further proceedings and a determination on the merits. Preliminary injunctive relief may not be granted unless the plaintiffs demonstrate—

(1) that [they] will suffer *irreparable injury* if the injunction is not granted; (2) that such injury *outweighs* any *harm* which granting injunctive relief would

---

teacher and should choose a different book for his/her report.

The teacher shall supply the student with a request for reconsideration form when he makes his objection.

*Books for in-depth class study*: If any student or parent has a valid objection to any book discussed in any classroom, he/she should follow the steps to have the book reconsidered. The teacher shall supply the student with an alternate book for equal credit. The above excludes textbooks.

*Audio-visual*: Each teacher must/will assume responsibility for the quality of any enrichment materials used in his/her classrooms.

5. *See* 42 U.S.C. § 1983.

inflict on the defendant[s]; (3) that plaintiff[s] [have] exhibited a *likelihood of success on the merits*; and (4) that the *public interest* will not be adversely affected by the granting of the injunction. *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981), *quoting Women's Community Health Center, Inc. v. Cohen*, 477 F.Supp. 542, 544 (D.Me.1979) (emphasis added).

## (1)
### Irreparable Injury

Plaintiffs predicate the pending action on alleged deprivations of their first and fourteenth amendment rights. "It is well established that the loss of first amendment freedoms constitutes irreparable injury." *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981) [plausible "chilling effect" on exercise of right of expression satisfies irreparable-harm requirement]. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) [first amendment right of association]; *Keefe v. Geanakos*, 418 F.2d 359, 363 (1st Cir. 1969) ["Academic freedom is not preserved by compulsory retirement, even at full pay."]

Plaintiffs have made a clear showing that irreparable injury is likely to result before a determination can be made on the merits unless preliminary injunctive relief is granted.

## (2)
### Counterbalancing the Hardship

Whatever injury preliminary injunctive relief might cause the defendants is inconsiderable in comparison with the severe impact upon plaintiffs absent interim relief. Any denial of plaintiffs' rights pending a determination on the merits would work an *irretrievable* loss of constitutionally-guaranteed liberties for which no adequate remedy exists at law. The defendants point to no qualitatively-comparable right of their own which would be adversely affected by restoring *365 Days* to the library pending a decision on the merits.

6. Complaint, at 6.

## (3)
### Likelihood of Success on the Merits

The probability of success on the merits "has loomed large in cases before [the First] Circuit," *Auburn News Co., Inc. v. Providence Journal Co.*, 659 F.2d 273, 277 (1st Cir. 1981).

### First Amendment Rights.

 Plaintiffs demand redress of their first amendment "rights of freedom of speech [and] freedom of access." [6] In order to prevail on the merits, plaintiffs must demonstrate that their basic first amendment rights have been "directly and sharply implicated" by the ban, *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968), whereupon the defendants must show that encroachment upon first amendment rights was warranted by a sufficient state interest. *Compare Elrod v. Burns*, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976) [patronage dismissals require showing of *paramount* state interest] *and Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 98–99, 92 S.Ct. 2286, 2291–2292, 33 L.Ed.2d 212 (1972) [restrictions on expressive conduct in true public forum require showing of *substantial* state interest] *with Tinker v. Des Moines Indep. School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) [less stringent showing of state interest required in "school environment"] *and Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968) [variable obscenity standard based on *rational* legislative determination that materials might be harmful to minors held constitutional]. The existence of a sufficient state interest does not end the matter. The burden of persuasion that there has been no *unnecessary* abridgement of first amendment rights rests with the defendants. *Elrod v. Burns*, 427 U.S. at 362–63, 96 S.Ct. at 2684; *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976).

The banning of *365 Days* could be viewed as not directly and sharply implicating a basic constitutional right under some recent

authority. *See Zykan v. Warsaw Community School Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980) [first amendment not implicated unless removal is part of attempt to purge library materials conflicting with committee orthodoxy or book is otherwise completely unavailable to students]; *Pico v. Bd. of Educ.*, 638 F.2d 404, 414–15 (2d Cir. 1980), *cert. granted*, —— U.S. ——, 102 S.Ct. 385, 70 L.Ed.2d 205 (Sifton, J., plurality opinion) [ban does not directly and sharply implicate basic constitutional values unless circumstances are so unusual and irregular as to create misunderstanding as to its scope and purpose thereby chilling other forms of expression by teachers, librarians, and students]; *id.* at 432 (Newman, J., concurring) [removal encroaches on first amendment if it tends to suppress ideas]. Other courts disagree. *See Minarcini v. Strongsville City School Dist.*, 541 F.2d 577, 583 (6th Cir. 1976) [right of students to receive information is implicated by book removal]; *Salvail v. Nashua Bd. of Educ.*, 469 F.Supp. 1269, 1274 (D.N.H.1979) [secondary school library magazine protected by first amendment]; *Right to Read Defense Comm. v. School Comm.*, 454 F.Supp. 703, 712–14 (D.Mass.1978) [right to read implicated by banning of book because of its theme and offensive language].

More than a decade ago the Supreme Court handed down its landmark decision in *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), recognizing that secondary school students "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate."

*Id.* at 511, 89 S.Ct. at 739. The Court struck down a regulation prohibiting secondary students from wearing black armbands in school as a form of silent protest against the Vietnam War, on the ground that the regulation encroached impermissibly upon the students' first amendment right of free expression absent a showing that the regulated conduct would materially disrupt classwork or substantially intrude upon the privacy of others. *Id.* at 513, 89 S.Ct. at 740. The first amendment right of secondary students to be free from governmental restrictions upon nondisruptive, nonintrusive, silent expression in public schools was sustained by the Court in *Tinker* notwithstanding full awareness of the "comprehensive authority" traditionally accorded local officials in the governance of public schools. *Id.* at 507, 89 S.Ct. at 736. *See id.* at 515–26, 89 S.Ct. at 741–46 (Black, J., dissenting).

With but one exception,[7] it does not appear that the banning of *365 Days* deprived these plaintiffs of their first amendment right to *initiate* expression. Book bans do not directly restrict the readers' right to initiate expression but rather their right to receive information and ideas, *the indispensable reciprocal of any meaningful right of expression, Procunier v. Martinez*, 416 U.S. 396, 408, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224 (1974); *Kleindienst v. Mandel*, 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581–82, 33 L.Ed.2d 683 (1972); *Lamont v. Postmaster General*, 381 U.S. 301, 308, 85 S.Ct. 1493, 1497, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring).

**7.** The threatened confiscation of *365 Days* from Michael Sheck on school premises plainly implicates the constitutional right of secondary students to initiate nondisruptive, nonintrusive expression on school premises. *See Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969). *Cf. Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) [wearing jacket displaying 'the word' in public]. Defendants do not allege and it does not appear from the present record that the threatened confiscation related in any way to the preservation of school discipline or to the protection of privacy. *See* 393 U.S. at 513–14, 89 S.Ct. at

740. This kind of symbolic expression by secondary school students was held to involve "direct, primary First Amendment rights akin to 'pure speech,' " *id.* at 508, 89 S.Ct. at 737, protected by the first and fourteenth amendments, *id.* at 513, 89 S.Ct. at 740.

Although Michael Sheck graduated from Woodland High School prior to the commencement of this action and therefore arguably would not benefit from injunctive relief, except perhaps as a resident adult permitted library access, other plaintiffs currently attending Woodland High School and Woodland Junior High School have a direct personal stake in preliminary injunctive relief.

Although its constitutional contours remain rudimentary, the right to receive information and ideas has been recognized by the United States Supreme Court in a variety of contexts. *E.g. Procunier v. Martinez*, 416 U.S. 396, 408, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224 (1974) [individual *right to receive uncensored mail* from prisoner]; *Stanley v. Georgia*, 394 U.S. 557, 564, 568, 89 S.Ct. 1243, 1247, 1249, 22 L.Ed.2d 542 (1969) [individual *right to receive* "information and ideas, regardless of their social worth" and *right to read* obscene material, at least in privacy of home]; *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969) [public *right of access* to social, political, esthetic, moral and other *ideas*]; *Lamont v. Postmaster General*, 381 U.S. 301, 308, 85 S.Ct. 1493, 1497, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring) [individual *right to receive mail publications*]; *Martin v. City of Struthers*, 319 U.S. 141, 143, 149, 63 S.Ct. 862, 863, 866, 87 L.Ed. 1313 (1943) [*right to receive* home delivery of religious *literature*]; *see also Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945).

▪ Courts recognizing a constitutional right to receive information emphasize the inherent societal importance of fostering the free dissemination of knowledge and ideas in a democratic society. *E.g. Kleindienst v. Mandel*, 408 U.S. at 763, 92 S.Ct. at 2581; *Martin v. City of Struthers*, 319 U.S. 141, 145, 63 S.Ct. 862, 864, 87 L.Ed. 1313 (1943). The right to receive information does not depend on the existence of an attempted direct personal communication between the speaker and the recipient, *see Virginia State Bd. of Pharmacy v. Virginia Citizens Council*, 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1822–23, 48 L.Ed.2d 346 (1976) [first amendment rights of *potential* recipi-

ents violated by statute prohibiting drug-price advertisements], nor upon there being no other way to obtain the information, *id.* at 757 n.15, 96 S.Ct. 1823 n.15.

The full force of the reasoning in these cases is particularly apposite in the *educational* environment of the secondary school library. The public school remains a most important public resource in the training and development of youth for citizenship and individual fulfillment. "The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted." *Meyer v. Nebraska*, 262 U.S. 390, 400, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923).[8] The right to receive information and ideas "is 'nowhere more vital' than in our schools and universities." *Kleindienst v. Mandel*, 408 U.S. 753, 763, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972); *see also Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). Secondary school libraries are "forum[s] for silent speech," *Minarcini v. Strongsville City School Dist.*, 541 F.2d 577, 583 (6th Cir. 1976), and "warehouses of ideas," *Right to Read Defense Comm. v. School Comm.*, 454 F.Supp. 703, 710 (D.Mass.1978). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957) [investigation of university professor]; *cf. Widmar v. Vincent*, —— U.S. ——, ——, n.5, 102 S.Ct. 269, 273, n.5, 70 L.Ed.2d 440 [university campus shares characteristics of public forum and is peculiarly the marketplace of ideas].

▪ The robust traditions of public education in our constitutional jurisprudence contradict assertions that the Bill of Rights constrains the abridgement of free expres-

---

8. Perhaps for these reasons the Supreme Court has said that

 '[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools,' *Shelton v. Tucker*, 364 U.S. 479, 487 [81 S.Ct. 247, 251, 5 L.Ed.2d 231] 1960. As this Court said in

*Keyishian v. Board of Regents*, the First Amendment 'does not tolerate laws that cast a pall of orthodoxy over the classroom.' 385 U.S. 589, 603 [87 S.Ct. 675, 683, 17 L.Ed.2d 629] (1967).

*Epperson v. Arkansas*, 393 U.S. 97, 104–105, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).

sion for the exclusive benefit of the speaker, *cf. Virginia State Bd. of Pharmacy v. Virginia Citizens Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) [right of consumers to receive information in drug advertisements], or of adults, *see, e.g., Tinker v. Des Moines Indep. School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Public schools are major marketplaces of ideas, and first amendment rights must be accorded all "persons" in the market for ideas, including secondary school students, *id.* at 511, 89 S.Ct. at 739, seeking redress of state action banning a book from the "warehouse of ideas," *see Right to Read Defense Comm. v. School Comm.*, 454 F.Supp. 703, 710 (D.Mass.1978). The way would be open to pare the protections of the first amendment to constitutional insignificance in our public schools were courts to accede to suggestions, *see, e.g., Zykan v. Warsaw Community School Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980); *Pico v. Bd. of Educ.*, 474 F.Supp. 387, 397 (E.D.N.Y.1979), *rev'd*, 638 F.2d 404 (2d Cir. 1980), that the banning of a library book, *the least obtrusive conventional communication resource available*, does not at least presumptively implicate the reciprocal first amendment right of secondary students to receive the information and ideas there written.[9]

It stands to reason that the state may have a greater responsibility to protect youth from obscenity than from materials merely deemed objectionable on vocabular grounds. Yet the state may not impede individual expression even on obscenity grounds except in accordance with judicially-supervised standards requiring a showing that the challenged expression, taken as a whole, lacks "serious literary, artistic, political, or scientific value" and "appeal[s] to the prurient interest in sex," *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973) [adult obscenity]; *cf. Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) [variable obscenity rule permits less stringent standards for materials directed at minors]; *Keefe v. Geanakos*, 418 F.2d 359, 362 (1st Cir. 1969) ["What is to be said or read to students is not to be determined by obscenity standards for adult consumption. At the same time, the issue must be one of degree."] How anomalous and dangerous then to *presume* that state action banning an entire book, where the social value of its content is roundly praised and stands unchallenged by the state, does not directly and sharply implicate first amendment rights because the ban was not *intended* to suppress ideas.

The social value of the conceptual and emotive content of censored expression is not to be sacrificed to arbitrary official standards of vocabular taste without constitutional recourse. *See Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971) [State may not "seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views."] As long as words convey ideas, federal courts must remain on

---

9. Although federal courts are understandably reluctant to review school library book bans in deference to the traditional prerogatives of local school authorities and for fear of inviting a flood of litigation, *see, e.g., Pico v. Bd. of Educ.*, 638 F.2d 404, 414–15 (2d Cir. 1980) (Sifton, J., plurality opinion), "the judiciary's role of final arbiter of the validity of all laws and protector of the people, young and old, from the exercise of unconstitutional power," *Breen v. Kahl*, 419 F.2d 1034, 1038 (7th Cir. 1969), *cert. denied*, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970) [school regulation regarding student hair styles], bars their retreat.

The institutional burdens on the judiciary resulting from the need to sift the circumstances in all library book-banning challenges could be considerable, but "[t]he First and Fourteenth Amendments have never been treated as absolutes...." *Miller v. California*, 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973). This may not be an easy road, free from difficulty. But no amount of 'fatigue' should lead us to adopt a convenient 'institutional' rationale—an absolutist, 'anything goes' view of the First Amendment—because it will lighten our burdens [footnote omitted]. 'Such an abnegation of judicial supervision in this field would be inconsistent with our duty to uphold the constitutional guarantees....' Our duty admits of no 'substitute for facing up to the tough individual problems of constitutional judgment involved in every obscenity case.' *Id.* at 29–30, 93 S.Ct. at 2617–2618 (Burger, C. J., majority opinion).

first-amendment alert in book-banning cases, even those ostensibly based strictly on vocabular considerations. A less vigilant rule would leave the care of the flock to the fox that is only after their feathers.

*Countervailing Interests.*

The recognition that first amendment rights are directly and sharply implicated does not end the inquiry. An appropriate balance and, if possible, a reasonable accommodation, must be struck among the traditional rights of parents in the rearing of their own children, *see, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 213–14, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972); *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 400, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923); *Presidents' Council, Dist. No. 25 v. Community School Bd. No. 25*, 457 F.2d 289, 292, n.5 (2d Cir. 1972); *Davis v. Page*, 385 F.Supp. 395, 405–06 (D.N.H.1974), the power of the state to control public schools, *see, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972); *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 507, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969); *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968), and individual rights of free expression. In the context of public school education considerable deference must be accorded parents and local school authorities in deter-

mining the effect upon students of exposure to reading material.

Parents do not surrender their right "to control the education of their own [children]," *Meyer v. Nebraska*, 262 U.S. 390, 401, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923), by enrolling them in public school, except to the extent that the prescribed curriculum serves legitimate educational purposes, *Davis v. Page*, 385 F.Supp. 395, 405–06 (D.N.H. 1974) [music "distasteful" to parents for religious reasons insufficient to require that children be excused from music class on parental request].

"[T]he power of the state to control the conduct of children reaches beyond the scope of its authority over adults...." *Prince v. Massachusetts*, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944); *see also Ginsberg v. New York*, 390 U.S. 629, 638, 88 S.Ct. 1274, 1279, 20 L.Ed.2d 195 (1968) [sustaining application of variable obscenity standard]. In fact the independent police power of the state to regulate the public conduct of minors may be paramount to parental power over their own children, *see, e.g., Prince v. Massachusetts*, 321 U.S. at 170, 64 S.Ct. at 444 [sustaining conviction of guardian for allowing nine-year-old daughter to sell religious material on street], provided there is a "rational" basis for the state to find that harm might otherwise result to the minor, *see Ginsberg v. New York*, 390 U.S. at 639, 88 S.Ct. at 1280.[10]

The parties have given insufficient consideration to the *derivative power* of local

---

**10.** In *Ginsberg*, the Supreme Court felt unable to rule that a finding by the New York Legislature that certain "obscene" material would be harmful to minors was irrational. 390 U.S. at 643, 88 S.Ct. at 1282. Mr. Justice Brennan, speaking for the Court, demonstrated that the view that obscenity may precipitate antisocial conduct or produce harmful effects in youth may be rationally held:

> ... But despite the vigor of the ongoing controversy whether obscene material will perceptibly create a danger of antisocial conduct, or will probably induce its recipients to such conduct, a medical practitioner recently suggested that the possibility of harmful effects to youth cannot be dismissed as frivolous. Dr. Gaylin of the Columbia University Psychoanalytic Clinic, reporting on the views

of some psychiatrists in 77 Yale L.J., at 592–593, said:

> 'It is in the period of growth [of youth] when these patterns of behavior are laid down, when environmental stimuli of all sorts must be integrated into a workable sense of self, when sensuality is being defined and fears elaborated, when pleasure confronts security and impulse encounters control—it is in this period, undramatically and with time, that legalized pornography may conceivably be damaging.'

Dr. Gaylin emphasizes that a child might not be as well prepared as an adult to make an intelligent choice as to the material he chooses to read:

> '[P]sychiatrists ... made a distinction between the reading of pornography, as unlikely to be per se harmful, and the permitting of

school authorities, on parental request, to restrict the vocabular form which the communication of information and ideas may take in the extracurricular environment of the school library. The state may determine that parents in their role as the primary guardians of their children "are entitled to the support of laws designed to aid discharge of that responsibility." *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968).[11] The state may see "fit to insure [that] a particularly sensitive subject be left to the wisdom of parents." *Mercer v. Michigan State Bd. of Educ.*, 379 F.Supp. 580, 586 (E.D.Mich. 1974) (three-judge district court), *aff'd.* mem., 419 U.S. 1081, 95 S.Ct. 673, 42 L.Ed.2d 678 (1974) [upholding statute prohibiting birth control instruction in public schools, but permitting local school option to offer elective course in sex education.] The court would be loathe on the present record to rule out an appropriate parental

role in prescribing standards of taste in the reading materials to which one's *own* children may be exposed in the *extracurricular* environment of the school library.[12] *But cf. Keefe v. Geanakos*, 418 F.2d 359, 361–63 (1st Cir. 1969) [reversing denial of preliminary injunction to tenured *teacher* threatened with dismissal for use of 'the word' in *classroom*].

■ The information and ideas in books placed in a school library by proper authority are protected speech and the first amendment right of students to receive that information and those ideas is entitled to constitutional protection.[13] A book may not be banned from a public school library in disregard of the requirements of the fourteenth amendment.

*Fourteenth Amendment.*

■ The Fourteenth Amendment to the Constitution of the United States pro-

---

the reading of pornography, which was conceived as potentially destructive. The child is protected in his reading of pornography by the knowledge that it is pornographic, i.e., disapproved. It is outside of parental standards and not a part of his identification processes. To openly permit implies parental approval and even suggests seductive encouragement. If this is so of parental approval, it is equally so of societal approval—another potent influence on the developing ego.'

*Id.* at 642 n.10, 88 S.Ct. at 1282 n.10.

**11.** The Supreme Court in *Ginsberg* quoted the following language with approval—

While the supervision of children's reading may best be left to their parents, the knowledge that parental control or guidance cannot always be provided and society's transcendent interest in protecting the welfare of children justify reasonably regulation of the sale of material to them. It is, therefore, altogether fitting and proper for a state to include in a statute designed to regulate the sale of pornography to children special standards, broader than those embodied in legislation aimed at controlling dissemination of such material to adults.

390 U.S. at 640, 88 S.Ct. at 1281.

**12.** *See note* 20 *infra.*

**13.** At least one court has said that because a school board has no obligation to establish a library or to select a particular library book it may not be prevented from removing a book,

*President's Council, Dist. 25 v. Community School Bd. No. 25*, 457 F.2d 289, 293 (2d Cir. 1972), *cert. denied*, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972), but that reasoning has been refuted in *Minarcini v. Strongsville City School Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) and in *Right to Read Defense Comm. v. School Comm.*, 454 F.Supp. 703, 712 (D.Mass.1978).

We are well beyond the belief that any manner of state regulation is permissible simply because it involves an activity which is part of the university structure and is financed with funds controlled by the administration. The state is not necessarily the unrestrained master of what it creates and fosters. Thus in cases concerning school-supported publications or the use of school facilities, the courts have refused to recognize as permissible any regulations infringing free speech when not shown to be necessarily related to the maintenance of order and discipline within the educational process. [Citations omitted.]

*Antonelli v. Hammond*, 308 F.Supp. 1329, 1337 (D.Mass.1970); *quoted in Bazaar v. Fortune*, 476 F.2d 570, 575 (5th Cir. 1973). Analogous authoritative disapproval of the doctrine in *President's Council* is found in *Widmar v. Vincent*, —— U.S. ——, at —— –——, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 [8–1 decision], where the United States Supreme Court held that a university, though not required to do so, did create a constitutionally-protected forum by making its facilities generally available for student activities.

hibits the states from depriving "any person of life, liberty, or property, without due process of law...." U.S.Const. amend. 14, § 1. The fourteenth amendment protects first amendment liberties, including freedom of speech, against state infringement. *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1322, 12 L.Ed.2d 377 (1964); *Fiske v. Kansas,* 274 U.S. 380, 387, 47 S.Ct. 655, 657, 71 L.Ed. 1108 (1927). First Amendment free speech is a fundamental individual liberty which no state may withhold without due process. *Lovell v. Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938); *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925). The protections of the fourteenth amendment extend to all "persons," including secondary school students. *Tinker v. Des Moines Indep. School Dist.,* 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969). The procedural regularity required by the fourteenth amendment constrains all creatures of the state, "[b]oards of [e]ducation not excepted." *West Virginia State Bd. of Educ. v. Barnett,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). The duties of school boards must be exercised "consistently with federal constitutional requirements." *Morgan v. McDonough,* 548 F.2d 28, 32 (1st Cir. 1977); see also *Salvail v. Nashua Bd. of Educ.,* 469 F.Supp. 1269, 1273 (D.N.H.1979).

 Arbitrary official interference with the free flow of information and ideas is unconstitutional. Public officials cannot exercise overbroad discretion to censor speech. *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974).[14] In order to avoid chilling legitimate speech-related conduct, governmental regulation of free speech must be limited by reasonably precise "ascertainable standards." *Keyishian v. Bd. of Regents,* 385 U.S. 589, 603–04, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967)

["Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms...."]; *Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975); *Shanley v. Northeast Indep. School Dist.,* 462 F.2d 960, 977 (5th Cir. 1972).

There is no more appropriate context than the present for the careful delineation and observance of "due process" standards and procedures. The convergence of so many sensitive individual and societal interests poses a constant threat of constitutional collision. The fourteenth amendment has been held to mandate that governmental units adhere to their own rules and regulations. *United States ex rel. Accardi v. Shaugnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) [regulations of Attorney General for processing applications of aliens]; *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1959) [State Department procedures for dismissal of employee on loyalty grounds]; *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959) [Interior Department regulations for employee suspension]; *Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963) [congressional committee rules for conducting executive session]; *Salvail v. Nashua Bd. of Educ.,* 469 F.Supp. 1269, 1273 (D.N.H.1979) [failure of school board to follow procedures for removal of magazine from school library]. Adherence to established procedures is essential to prevent the kind of arbitrary action that is inherent in the violation by a governmental agency of its own rules. *Associated Builders v. United States Dep't of Energy,* 451 F.Supp. 281, 289 (S.D.Tex. 1978).

The Supreme Court has held that there must be adequate procedures by which those affected by state action inhibiting the availability of reading material may safe-

---

14. The Supreme Court has frequently condemned, because of their potential for selective suppression of ideas, licensing schemes lodging broad discretion in public officials to restrict particular forms of expression. *See, e.g., Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 97, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972). See also *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972), for cases requiring explicit standards for the guidance of those who apply them, particularly where the statute "abuts upon sensitive areas of basic First Amendment freedoms," *id.* at 109, 92 S.Ct. at 2299.

guard their first amendment rights. *See, e.g., Bantam Books v. Sullivan*, 372 U.S. 58, 59, 66, 83 S.Ct. 631, 633, 637, 9 L.Ed.2d 584 (1963) [practices of state commission charged with educating "the public concerning any book ... containing obscene, indecent or impure language..." held unconstitutional]; *see also Loewen v. Turnipseed*, 488 F.Supp. 1138 (N.D.Miss.1980) [students and parents must be provided means of vindicating first amendment rights denied by state-created textbook approval committee]. Another court has required a school board to act "with full information, with reason and deliberation, and with the full benefit of the views of supervisors, principals, and others familiar with the curriculum and teaching techniques in the schools..." in deciding whether to dismiss a teacher for discussing controversial issues in the classroom. *Sterzing v. Fort Bend Indep. School Dist.*, 376 F.Supp. 657, 661 (S.D.Tex.1972). Nothing that has as yet been brought to the attention of the court would warrant relaxation of these procedural standards in library book-removal cases.[15]

▆▆▆ The legitimacy of the *Committee* action in this case may ultimately depend in part upon whether it could *rationally* conclude that exposure to *365 Days* might be harmful to students.[16] *Cf. Ginsberg v. New York*, 390 U.S. 629, 641, 88 S.Ct. 1274, 1281,

20 L.Ed.2d 195 (1968). The *Committee* rationale was neither articulated nor memorialized. The record discloses no finding that harm might result to students exposed to the coarse language in *365 Days*. It may be considered implicit in the Committee vote that three of its members found the language "objectionable," but it does not appear that the ban was predicated on a *Committee* determination that exposure might be *harmful* to students. Two Committee members testified that certain words in *365 Days* were considered *inappropriate* for use by or to students, but no evidence has been presented that even these Committee members believed that *harm* might result to *all* students exposed to such language. Although a rational demonstration that harm might result to some students may be possible in these circumstances, by reason of their tender age or lack of sophistication or maturity, it is not an acceptable *assumption* that all students, regardless of their age or maturity, might be harmed by exposure to such language. *Cf. Mailloux v. Kiley*, 448 F.2d 1242–43 (1st Cir. 1971) [Restrictions on student access to "objectionable" language must be predicated, *inter alia*, on "the age and sophistication of the students...."]

The identification of criteria considered by the Committee in determining to ban *365 Days* is complicated by the utter ab-

**15.** Although the First Circuit has sustained discretionary state action withholding funds from a literary magazine because of a poem which officials considered "an item of filth," the court found it "most troubling" that the denial of support "should be based on a reading of just one poem in a back issue, without consideration of the overall quality of the publication either alone or as compared to competing grant applicants." *Advocates For Arts v. Thomson*, 532 F.2d 792, 797 (1st Cir.), *cert. denied*, 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976). The banning of *365 Days*, for which public funds had already been expended, without first reading or considering the overall quality of the censored expression, may be violative of the principle that discretionary official action regulating expression must be accompanied by "rigorous procedural safeguards," *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 561, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975), and the requirement that official discretion be

hedged by "narrow, objective and definite standards," *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969).

A library book ban presupposes reversal of the decision by appropriate school authorities to acquire the book in the first place. Consideration should be given to whether the initial determination to make the book available is entitled to a presumption of procedural regularity *see* Note, *Schoolbooks, School Boards, and the Constitution*, 80 Colum.L.Rev. 1092, 1123–24 (1980), which may only be overcome by adequate findings based on ascertainable standards.

**16.** Of course, it may be appropriate to require an even more rigorous showing where state action is aimed at restricting access to concededly nonobscene materials deemed objectionable on vocabular grounds only.

sence of procedural ground rules [17] or minutes memorializing the Committee rationale. Until the adoption of the Baileyville School Department Challenged Material Policy, there were no prescribed policies, guidelines or criteria for the consideration of challenged materials by teachers, administrators, parents, students, or the Committee. The Committee appears to have considered the challenge to *365 Days* on the basis of the subjective standards of its individual members.

There is no direct evidence that *365 Days* was banned because of its conceptual or emotive content.[18] There is no suggestion that the Committee acted on obscenity grounds. The direct evidence suggests instead that *365 Days* was banned because three Committee members considered some of its language, although not obscene, inappropriate for use in a library book available to students.[19]

The criteria to be considered in advance of state action restricting student access to "objectionable" language include "the age and sophistication of the students, the closeness of the relation between the specific technique used and some concededly valid educational objective, and the content and manner of presentation." *Mailloux v. Kiley*, 448 F.2d 1242–43 (1st Cir. 1971).[20]

There is no evidence that the Committee has accorded appropriate consideration to these criteria. The ban was imposed without regard to the age and sophistication of students. It is difficult to understand how at least two members of the Committee, who have not read the book, could have given fair consideration to its content.

There is a strong likelihood that the Committee ban is unconstitutional by reason of its overbreadth. In nearly every respect the ban appears unnecessarily broad, lacking in the required "narrow specificity," and fashioned without the use of "sensitive tools." *See Pico v. Bd. of Educ.*, 638 F.2d 404, 417 (2d Cir. 1980) (Sifton, J. plurality opinion), *cert. granted*, ―― U.S. ――, 102 S.Ct. 385, 70 L.Ed.2d 205, *citing Keyishian v. Bd. of Regents*, 385 U.S. at 603–04, 87 S.Ct. at 683–84. The ban cannot be considered as "minimally intrusive" an infringement of first amendment rights as could have been devised. *See id.; United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). The entire book has been banned, not only its "objectionable" language. The ban applies to adults as well as students and to mature as well as immature students, regardless of their age or sophistication. The ban prohibits peaceable possession of private copies of

---

**17.** School personnel simply passed complaints along the "chain of command." The chairperson of the Woodland High School English Department identified a written *complaint* form which can in no sense be considered a challenged materials *policy*. It was not used in this instance and there is no evidence that it has ever been used.

**18.** The court does not suggest that there is no evidence of a Committee intent to suppress ideas. The arbitrariness of the Committee refusal to submit *365 Days* for consideration under its own new challenged material policy could well be considered evidence of pretextual censorship, as could the overbreadth of the ban itself which neither distinguishes between mature and immature students, nor between students and adults.

**19.** Measured by the criteria later adopted by the Committee itself, *see* 'Baileyville School Department Challenged Material Policy,' note 4 *supra*, the Committee action banning *365 Days* appears seriously deficient due to its procedural irregularity, arbitrariness, vagueness, and overbreadth.

**20.** These criteria, requiring case-by-case application, would seem to impose an onerous administrative burden upon the local superintending school committee, which would have little occasion and less time to evaluate, for instance, the sophistication of individual students. Librarians and teachers possess certain expertise not as likely to be found on the local school committee, especially in the area of assessing individual-student intellectual and literary interests and sophistication. On the other hand, as a general rule parents are better suited to the task of evaluating the emotional and intellectual maturity and sophistication of their *own* children. The expertise of parents is based on a more fully informed understanding and concern for the social, educational, cultural, moral and spiritual well-being and development of their own children.

the book anywhere on school property, including buses.[21]

## IV.

### *Public Interest*

The final prerequisite to preliminary injunctive relief implicates the public interest. *See Yakus v. United States*, 321 U.S. 414, 440–41, 64 S.Ct. 660, 674–75, 88 L.Ed. 834 (1944). The public interest carries considerable weight in these matters. *Id.* The court must weigh any hindrance or furtherance of the public interest likely to result from interim injunctive relief. *Id.*

The special sensitivity with which the courts must approach their responsibility for assuring compliance by local authorities with constitutional standards in the governance of public schools leaves little reason to doubt that the public interest is significantly implicated in this case. The United States Supreme Court put it this way in *Epperson v. Arkansas*, 393 U.S. 97, 104–05, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968):

Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. Our courts, however, have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief. By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. On the other hand, '[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools,' *Shelton v. Tucker*, 364 U.S. 479, 487 (81 S.Ct. 247, 251, 5 L.Ed.2d 231] (1960). As this Court said in *Keyishian v. Board of Regents*, the First Amendment 'does not tolerate laws that cast a pall of orthodoxy over the classroom.' 385 U.S.

589, 603 [87 S.Ct. 675, 683, 17 L.Ed.2d 629] (1967). (Footnote omitted.)

The court cannot escape the recognition that courts may not entirely avert interposition in local school administration without abdicating their "role of final arbiter of the validity of all laws and protector of the people, young and old, from the governmental exercise of unconstitutional power," *Breen v. Kahl*, 419 F.2d 1034, 1038 (7th Cir. 1969). Yet, in the opinion of this court the preliminary injunctive relief interposed in this case represents the minimum required to enable performance of its constitutional function. The important principles of federalism, soundly approached, do not require that federal courts cede their constitutional role to local school boards.

The interim injunctive relief granted here well serves the public interest in several important respects. It minimizes significant intrusion upon any of the important public policies competing for preeminence in the present controversy. It prevents any irreparable loss of important individual liberties during the interim before the parties can be fully heard on the merits. Traditional parental prerogatives in rearing their own children are accommodated with virtually no significant imposition upon majoritarian rights and interests.

## CONCLUSION

The court concludes that plaintiffs have made a strong showing of their entitlement to interim injunctive relief as required in *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981).

---

**21.** *See* note 7 *supra*.